Argued and submitted May 7, 2010, at Portland State University, Portland, Oregon, decision of Court of Appeals reversed; judgment of circuit court reversed, and case remanded to circuit court for further proceedings April 7, 2011

## STATE OF OREGON,
*Respondent on Review,*

*v.*

## KEVIN LEE HELZER,
*Petitioner on Review.*

(CC CFH050352; CA A133911; SC S058001)

252 P3d 288

Marc D. Brown, Deputy Public Defender, Office of Public Defense Services, Salem, argued the cause and filed the brief for petitioner on review.

Karla Ferrall, Assistant Attorney General, Salem, argued the cause for respondent on review. With her on the briefs were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Before De Muniz, Chief Justice, and Durham, Balmer, Kistler, Walters, and Linder, Justices.**

** Gillette, J., retired December 31, 2010, and did not participate in the decision of this case. Landau, J., did not participate in the consideration or decision of this case.

LINDER, J.

**LINDER, J.**

This is a companion case to *State v. Foster*, 350 Or 161, 252 P3d 292 (2011), decided this date. As does the defendant in *Foster*, defendant in this case challenges a warrantless search of his car, urging that an alert to the car by a drug-detection dog did not give police probable cause to search it for seizable evidence of drugs. As we will explain, we conclude that the state failed to carry its burden to establish that the dog alert in this case was sufficiently reliable to provide police with probable cause to search. We therefore reverse the decision of the Court of Appeals and the judgment of the circuit court, and remand to the circuit court for further proceedings.

Officer Stokoe lawfully stopped defendant's car and, after the stop, arrested defendant on an outstanding warrant. Stokoe asked defendant for consent to search the vehicle, but defendant refused that consent. Stokoe then had his drug-detection dog, Babe, conduct a "drug sniff" around the outside of defendant's car. Babe alerted to the passenger side and trunk area of defendant's car. Stokoe let Babe enter the car, at which point Babe alerted to two bags in the back seat. Stokoe opened the bags and found methamphetamine and a pair of scales. The pair of scales later tested positive for methamphetamine residue. Defendant was charged with possession of a controlled substance.

Before trial, defendant moved to suppress the evidence found in the search, arguing, as noted, that Babe's alert to his car was not sufficiently reliable to provide probable cause for the warrantless search.[1] After a hearing, the trial court denied the motion. Defendant appealed, challenging that ruling. The Court of Appeals affirmed. *State v. Helzer*, 231 Or App 567, 219 P3d 617 (2009).

---

[1] As in *Foster*, 350 Or at 169 n 3, the search in this case arose under the so-called "automobile" exception to the warrant requirement of Article I, section 9, of the Oregon Constitution and the parallel warrant requirement of the Fourth Amendment to the United States Constitution. *See generally State v. Brown*, 301 Or 268, 274-76, 721 P2d 1357 (1986) (officer may lawfully search stopped vehicle and its contents without warrant or consent if vehicle was mobile when stopped and if officer had probable cause). No issue has been raised in this case as to the application or scope of that exception. The only issue is whether, as the exception requires, Stokoe had the requisite probable cause to search.

Our decision in *Foster* announces the legal standards that apply here. As we hold in *Foster*, an alert by a properly trained drug-detection dog can provide probable cause to search. Whether such an alert does so in a particular case will depend on an individualized assessment of the totality of the circumstances known to police that bear on the dog's reliability in detecting drugs. Those circumstances usually will include, but are not limited to, the dog's and its handler's training, certification, and performance in the field. The state has the burden, upon a proper challenge by the defendant, to demonstrate that the dog's alert was sufficiently reliable to provide probable cause to search. *Foster*, 350 Or at 170, 177-78.[2]

In this case, the state relied exclusively on the testimony of Stokoe to describe how Babe had been certified and trained in drug detection, and how Stokoe had learned to work with Babe as her handler. The record made through Stokoe's examination by the state, and cross-examination by defendant, is sparse.

Babe was selected for training as a drug-detection dog by a private business or organization, "Code Three Canine." Stokoe had not yet purchased Babe, and had no involvement in her training by Code Three Canine. He did not describe the nature or details of that training. Stokoe stated only that Babe had been trained to detect the odors of four controlled substances: marijuana, methamphetamine, cocaine, and heroin.

---

[2] The fact that a particular dog alert in a given case is not sufficiently reliable to provide probable cause does not necessarily foreclose any reliance on or consideration of the alert. Assuming that the state can establish that the alert has some degree of reliability, the alert still may be considered along with *other* information in the totality of the circumstances analysis of whether officers searched with probable cause. *See, e.g., State v. Smith*, 327 Or 366, 263 P2d 642 (1998) (drug-detection dog's alert to defendant's storage facility one of several pieces of information set out in application for search warrant); *see generally State v. Coffey*, 309 Or 342, 347 n 7, 727 P2d 424 (1990) (significant doubts about the validity and rate of error in polygraph examinations preclude those examinations from being the sole basis for a probable cause determination, but examiner's opinion provides sufficient reliability to be considered along with other reliable information in the assessment of probable cause). In this case, however, the only information on which police relied to search defendant's vehicle was the dog's alert. The state therefore had the burden to establish that the dog's alert in this case was a sufficient basis, without more, to establish probable cause to search.

After he purchased Babe, Stokoe went through a two-week training program with an instructor from Code Three Canine. The purpose of that instruction was for Stokoe to learn how to work with Babe and how to train her to maintain and improve her skills. That two-week program entailed 114 hours of training. Stokoe was not asked to describe the details of that training, either in terms of what he was taught about handling Babe to maximize her accuracy and reliability, or what he learned through that training about Babe's reliability. He testified only that he and Babe, to complete the training successfully, had to "meet the standards of the trainer at the time."

After completing that training, Stokoe trained with Babe for a period of about six months. He estimated that, during that time, he trained for an additional 300 or more hours. He did not work with any formal drug-detection dog trainers. With the exception of about 10 days on which other dog-handler officers or members of his family assisted him, Stokoe worked with Babe entirely on his own.

Stokoe described his ongoing training with Babe in general terms only. In his training, he rewarded Babe for an alert by playing with her using a rolled-up cloth. He said that he used "training aids" to teach Babe to find drugs. Those training aids involved use of "a sample of the drug" that ranged in amounts from "residual odors up to a pound." Stokoe also used "blanks," which consisted of empty plastic containers, to ensure that Babe alerted to drugs and not the odor of the plastic containers that he used to hide training aides. The blanks that Stokoe used included "blank" vehicles—that is, vehicles that Stokoe believed would have no odor—so that he could be sure that Babe was not alerting to vehicles "just because she's used to alerting to vehicles." And Stokoe described using various foods to make sure that Babe did not alert to the scent of food rather than to that of drugs. Although Stokoe kept records of his training using drug samples, he kept no records of Babe's responses on blank containers and vehicles. He trained with Babe "wherever we [could] find a place to train at."

After that self-directed training period, Stokoe and Babe attended a four-day (32 hour) training session with the

Oregon Police Canine Association (OPCA), which is a private organization, not a state agency. Stokoe, who was not asked what the OPCA training session involved, gave no details or even a generalized description of it. He testified only that, at the conclusion of the session, he and Babe were certified by OPCA. The state did not establish in this case what standards OPCA applied to Stokoe and Babe for that certification. The state supplemented Stokoe's testimony with documentation of alerts in the field over a several-month period. Stokoe kept no records, however, of deployments in which Babe did not alert.

With that description of the record made at the motion to suppress, we turn back to whether, in this particular case, the state carried its burden to establish that Babe's alert was sufficiently reliable to establish probable cause to search. In *Foster*, we explained that the performance of a drug-detection dog and its handler under controlled circumstances, during formal training and certification, is especially meaningful in assessing the reliability of the individual dog's alert in a particular case. *Foster*, 350 Or at 177-78. To assess the dog's and handler's abilities based on their training and certification, however, more is needed than the fact that the two have received certification by a private organization. The record must provide information about the training that the dog and handler underwent, and the standards they had to meet to achieve certification.

The state in this case, however, established little beyond the bare fact that Babe and Stokoe had been certified by OPCA. A comparison to the record made in *Foster* reveals the voids. *See id.* at 164-68 (describing record). The drug-detection dog and its handler in *Foster* went through their initial formal training with OPCA and continued training with the assistance of an OPCA "master trainer." The record in *Foster* is significantly more developed on the particular training they received initially, as well as their continued training afterwards. The record is also significantly more developed on the OPCA certification test that they took, and the standards to which they were held in order to pass it. *See id.* (describing same). No similar record was made in this case. In particular, the nature of Babe's initial training by

Code Three Canine—the kind of training, its length, and the standards used—was not established by the state. Likewise, the record provides no description of or details about Stokoe and Babe's team training with Code Three Canine after Stokoe purchased Babe. Unlike in *Foster*, the record does not reveal what training Stokoe received to avoid handler cues or other errors that can cause a dog to alert falsely. Stokoe testified vaguely to his use of blanks and food distractions in his own training, but he provided no information beyond that to explain how his training builds accuracy and reliability in both Babe's abilities and his handling of Babe.[3]

To be sure, the state also provided some documentation of Babe's performance in the field. But as we explained in *Foster*, although a drug-detection dog's field performance is pertinent to assessing that dog's reliability, "more telling is the dog's performance in controlled circumstances, such as those involved in testing for certification, where the dog's ability to find and signal the presence of drugs can be accurately gauged." *Foster*, 350 Or at 177-78. In this case, as we have described, the record provides no information about Babe's training through Code Three Canine and only vague information about some, and not all, of Stokoe's training with Babe. Beyond that, the record establishes only the bare fact that Babe and Stokoe were certified by the OPCA, a private organization whose training methods and standards for certifying Babe and Stokoe were not established on this record. Without more information about Babe's training and certification, the field performance records that the state produced

---

[3] Some of what Stokoe described—in particular, his reference to the use of "residual odors" to train Babe—potentially could detract from Babe's reliability. As we explain in *Foster*, a "residual odor" describes a drug odor that is present even when the drug that produced the odor is not. It can occur because the odor persists after the drug has been consumed or removed, or because the odor is clinging to an object or a person who had contact with drugs in another location. *Id.* at 167. We conclude in *Foster* that the fact that drug-detection dogs are capable of smelling residual odors is not, in and of itself, a basis on which to conclude that a dog's alert does not provide probable cause. The fact—if it were established—that a dog had been affirmatively and deliberately trained to alert to residual odors, however, could be more problematic. In this case, Stokoe at other points referred to residual "amounts" of drugs, not residual "odors." His reference to residual odors may have been an inadvertent choice of terms. In all events, regardless of Stokoe's testimony on that point, the record here inadequately establishes the quality of Stokoe's and Babe's training and certification.

in this case are insufficient to establish that Babe was sufficiently reliable to provide probable cause to search defendant's car.[4]

Because of those deficiencies in the record, we conclude that the state did not carry its burden to show that Babe's alert in this case was sufficiently reliable to provide Stokoe with probable cause to search. The trial court therefore erred in denying defendant's motion to suppress.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

---

[4] Worth noting in that regard is that the trial court expressly found that Babe and Stokoe were "certified," but made no other pertinent findings and, in particular, did not make any express findings as to what conclusions the court drew (if any) from Stokoe's records of Babe's field performance records. Based on our review of those records, the conclusions to be drawn from them, even viewing them in the light most favorable to the trial court's ruling, are difficult to assess on the limited record before us (e.g., Stokoe's testimony explaining them was very limited; no records were kept of circumstances in which Babe did not alert when deployed; some records do not establish whether drugs found after Babe alerted were in a place consistent with where Babe alerted; some of the records are for deployments after the date of the search in this case). Although field performance records in general are *pertinent* to the inquiry, whether they in fact add to or detract from the reliability assessment in any particular case may depend on whether their significance is sufficiently developed through testimony at the hearing or is self-evident.