812                    August 7, 2014                    No. 52

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Petitioner on Review,*

*v.*

JOHN LEONARD HOLDORF, JR.,
*Respondent on Review.*

(CC 09061153; CA A144719; SC S060766)

En Banc

On review of a decision of the Court of Appeals.*

Argued and submitted June 13, 2013.

Leigh A. Salmon, Assistant Attorney General, Salem, argued the cause and filed the brief for petitioner on review. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Alice Newlin-Cushing, Deputy Public Defender, Salem, argued the cause and filed the brief for respondent on review. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

BALDWIN, J.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

_____

* Appeal from Linn County Circuit Court, Glen D. Baisinger, Judge. 250 Or App 509, 280 P3d 404 (2012).

**BALDWIN, J.**

Defendant was convicted of possession of marijuana, ORS 475.864(3), and possession of methamphetamine, ORS 475.894, after police officers stopped him and discovered those controlled substances on him. The trial court concluded that the officer who stopped defendant had a reasonable suspicion that defendant was involved in criminal drug activity and denied defendant's motion to suppress evidence of the drugs. The Court of Appeals reversed, holding that the officer did not have a reasonable suspicion of drug activity. *State v. Holdorf*, 250 Or App 509, 280 P3d 404 (2012).

We allowed review to determine whether, at the time of the stop, the officer had a reasonable suspicion that defendant was involved in criminal drug activity and, in particular, (1) whether the officer who stopped defendant could rely on factual information provided to him by other officers to establish "reasonable suspicion," and (2) whether the officer's observation that defendant appeared to be under the influence of methamphetamine, based on the officer's training and experience, was sufficient to establish "reasonable suspicion" that defendant had committed the crime of possession of methamphetamine when considered under the totality of the circumstances. We answer those questions in the affirmative, reverse the decision of the Court of Appeals, and affirm the judgment of the trial court.

In reviewing a denial of a motion to suppress, we are bound by the trial court's findings of historical fact that are supported by evidence in the record. *State v. Stevens*, 311 Or 119, 126, 806 P2d 92 (1991). If the trial court "[does] not make findings on all pertinent historical facts and there is evidence from which those facts could be decided more than one way, we will presume that the trial court found facts in a manner consistent with its ultimate conclusion." *Id.* at 127 (citing *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968)). On review, our role is to decide whether the trial court correctly applied the law to those historical facts. *State v. Peller*, 287 Or 255, 260, 598 P2d 684 (1979); *see also State v. Ehly*, 317 Or 66, 80, 854 P2d 421 (1993) (stating standard of review for "reasonable suspicion").

## I.  BACKGROUND

Albany Police Detective Davis was on duty when he observed a blue SUV occupied by Watts, who was driving, and defendant, a passenger. Davis recognized Watts, but he did not recognize defendant. Davis was familiar with Watts as a suspect through Davis's ongoing investigation of a local methamphetamine distribution ring. Davis also had received reports about Watts from Officer Fandrem, who had observed an occupant of the same SUV engage in an apparent drug deal two weeks earlier. On a separate occasion after that observation, Fandrem had attempted to stop Watts in the SUV, but Watts eluded capture after a high-speed chase. Davis also knew that Watts had been convicted of a felony and had an outstanding warrant for violating parole.

Davis put out a call to alert other officers in the area about Watts. Albany Police Officer Salang responded to that call. Davis gave Salang a description of the vehicle and told Salang that Watts was a criminal suspect in an ongoing drug investigation. Salang knew Watts from prior encounters and knew that Watts was a convicted felon with an outstanding warrant.

Shortly thereafter, Salang spotted Watts driving the SUV. Salang followed the SUV until he observed Watts commit a traffic infraction. He then activated his overhead lights and stopped the SUV. Salang called for backup before he approached the vehicle.

While Salang was talking to Watts, he observed that defendant "appear[ed] very nervous" and "very fidgety," and was "making minimal eye contact" with him. To Salang, defendant appeared to be "tweaking," meaning that he appeared to be under the influence of methamphetamine. Salang requested defendant's name and date of birth, which defendant provided.

Salang then ran warrant checks on Watts and defendant. Dispatch confirmed that Watts had a warrant for his arrest. Defendant, however, was "clear" of any warrant. Defendant asked if he could leave, and Salang told him that he could not leave at that time. At that point, Salang was still

waiting for backup officers to arrive. After backup arrived, the officers removed Watts from the SUV and secured him in a patrol car.

Salang then returned to the SUV, where defendant was still seated in the passenger seat. At that time, Salang was preparing to perform an inventory of the vehicle for a nuisance tow. He asked defendant if there were any weapons or contraband in the vehicle. Defendant responded that there was a knife between the seat and the door. Defendant opened the passenger door and Salang saw the knife slide down between the seat and door jam. Defendant stepped out of the vehicle and Salang conducted a "pat down" search of defendant. He found a second knife and three small metal containers in defendant's pockets. Quantities of marijuana and methamphetamine were subsequently found inside the containers.

Defendant was arrested and charged with one count each of unlawful possession of marijuana, ORS 475.864(3), and unlawful possession of methamphetamine, ORS 475.894. Prior to trial, defendant moved to suppress the evidence obtained during the warrantless search and seizure of his person.[1] At the hearing on defendant's motion, Detective Davis and Officer Salang testified. Davis testified to his training and experience investigating narcotic crimes, and explained the information that he gave to Salang about Watts. Salang testified that, during his law enforcement career, he had regular contact with people who possess or are under the influence of methamphetamine, and that he was familiar with common practices relating to the use of methamphetamine.

After considering the evidence, the trial court denied defendant's motion. The trial court concluded that Salang had a reasonable suspicion to stop defendant for suspected drug crimes and that Salang's safety concerns justified keeping defendant at the scene when he requested to

---

[1] Although defendant raised a number of issues in his motion to suppress relating to inculpatory statements that he made and drug evidence that was seized, his assignments of error in the Court of Appeals were limited to the validity of the stop (*i.e.*, the seizure of his person) by Salang. The parties agree that the stop occurred when defendant asked if he could leave and Salang told defendant that he could not. Defendant contends that his statements and the drug evidence should have been suppressed because the stop was illegal.

leave. Defendant then entered a conditional guilty plea pursuant to ORS 135.335(3) and reserved his right to challenge on appeal the trial court's denial of his pretrial motion to suppress.

On appeal, the Court of Appeals concluded that the specific and articulable facts in this case did not support a reasonable suspicion that defendant was involved in criminal activity when he was stopped. It noted that the only fact cited by Salang that directly related to defendant, as opposed to the SUV or Watts, was defendant's nervous, fidgety demeanor. It reasoned that, even if those characteristics could, in some circumstances, be an indicator of present methamphetamine possession, defendant's demeanor, although consistent with methamphetamine use, could be caused by other non-incriminating factors. *Holdorf*, 250 Or App at 514. The court further concluded that defendant's seizure was not justified by officer safety concerns because all danger had dissipated by the time backup officers had arrived and Watts was arrested.[2] *Id.* at 515.

## II.   ANALYSIS

### A.   *"Reasonable Suspicion" Standard*

Defendant based his motion to suppress on ORS 131.615(1) and Article I, section 9, of the Oregon Constitution.[3] We therefore first examine the statute establishing the standard that police officers are required to follow when making an investigatory stop of a person. ORS 131.615(1) provides:

> "A peace officer who reasonably suspects that a person has committed or is about to commit a crime may stop the person and, after informing the person that the peace officer is a peace officer, make a reasonably inquiry."

---

[2] The state did not seek review of the Court of Appeals' determination that the stop was not justified based on officer safety concerns. *Holdorf*, 250 Or App at 515. Therefore, the only issue for our determination is whether Officer Salang's seizure of defendant was based on a reasonable suspicion of criminal activity.

[3] Article I, section 9, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

An officer "reasonably suspects" criminal conduct when the officer

> "holds a belief that is reasonable under the totality of the circumstances existing at the time and place the peace officer acts * * *."

ORS 131.605(6).

As previously mentioned, this dispute is limited to whether Officer Salang reasonably suspected that defendant had committed or was about to commit a crime when he stopped defendant to investigate. Other provisions of the statutory framework relating to the permissible scope of the stop and frisk of persons, ORS 131.605 to 131.625, are not at issue in this case.

As this court has observed, ORS 131.615 was a legislative effort to codify state and federal case law permitting the temporary and limited restraint on liberty interests by police officers incident to investigatory stops. *State v. Valdez*, 277 Or 621, 625, 561 P2d 1006 (1977). Specifically, the legislation was intended as

> "'a codification of the peace officer's ability to stop a person as close to the *Terry* [*v. Ohio*, 392 US 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968)] and [*State v. Cloman*, 254 Or 1, 456 P2d 67 (1969)] rationale as possible while giving the courts leeway to interpret the protean situations that arise and giving the officer limited "stopping" powers.'"

*Valdez*, 277 Or at 625 (quoting the commentary to the final draft of the Proposed Oregon Criminal Procedure Code) (footnotes omitted). The codification contemplated

> "'* * * an objective test in the forefront of the stop determination. In other words, the test should be what a reasonable officer would think in this situation and not what this particular arresting officer thought.'"

*Id.* at 625-26 (quoting from the commentary to the final draft of the Proposed Oregon Criminal Procedure Code) (emphasis omitted).

This court has held that an analysis of a defendant's rights under ORS 131.605 to 131.625 is substantially the same as an analysis of a defendant's rights under the

search and seizure provisions of the Oregon and federal constitutions. *State v. Kennedy,* 290 Or 493, 497, 624 P2d 99 (1981); *see also [State v. Toevs](State v. Toevs)*, 327 Or 525, 534, 964 P2d 1007 (1998) (so stating). In 1997, the legislature limited the authority of courts to exclude relevant evidence in a criminal action "on the grounds that it was obtained in violation of any statutory provision" unless exclusion is required by the Oregon or federal constitution, the rules of evidence governing privileges and hearsay, or the rights of the press. ORS 136.432. Accordingly, our review in this case is limited to whether Article I, section 9, of the Oregon Constitution requires exclusion of the evidence identified in defendant's motion to suppress.

In *Valdez*, this court considered an Article I, section 9, challenge after police officers stopped the defendant when the defendant and two other men placed a paper bag into the trunk of an automobile in a part of town that the officers considered "to be one with a high incidence of vice activity." 277 Or at 623. The officers "had never seen any of the three men before and knew nothing of them," but considered the suspects' dress "like a typical pusher" and "not typical of persons found in the area." *Id.* at 623-24. The court held that the instinct and experience of the officers did not provide a sufficient basis for "reasonable suspicion" under ORS 131.615(1), without articulable facts pointing to criminal activity that could be objectively evaluated. *Id.* at 628. The court contrasted those circumstances with the facts in *Terry* and *Cloman*, where the stops were based on a reasonable suspicion of criminal activity:

> "It is apparent that in both *Terry* and *Cloman* the officers who stopped the defendants for questioning concerning criminal activity had a much greater fund of suspicious activity to justify objectively their suspicion of criminal activity than had the officers in the present case. Here there is insufficient evidence suggesting criminal activity which can be objectively evaluated. We do not have persons who 'didn't look right' repetitively taking turns conferring and looking surreptitiously into a store, nor do we have known copper wire thieves unloading copper wire into a private garage in the middle of the night. In this case we have persons who 'didn't look right' putting a paper bag into the trunk of an automobile—a not too remarkable action.

> "We recognize that the statutory standard for the stopping and questioning of a person concerning his possible criminal activity was intended to be less than the standard for probable cause to arrest. We also recognize that experienced police develop what amounts to an intuitive sixth sense about matters of this kind. As the officer testified, 'he *** looked real sharp *** like a typical pusher, to me.' Such instinct and experience cannot, however, form the entire basis for 'reasonable suspicion,' because no practical control can be exercised over police by courts if, in the absence of any very remarkable activity, the officer's instinct and experience may be used as the sole reason to justify infringement upon the personal liberty sought to be protected by the statute."

*Valdez*, 277 Or at 627-28. Thus, in *Valdez*, an objective review of the totality of the circumstances confronting the officers did not provide a basis for a reasonable suspicion that criminal activity was afoot.

We also reviewed the constitutionality of a stop in *State v. Lichty*, 313 Or 579, 835 P2d 904 (1992). In *Lichty*, a clerk in a convenience store found the defendant's wallet containing a plastic baggy of cocaine. The store owner told a police officer that "'I just found this wallet in the store, *** a bag of coke fell out of it,'" and that the defendant had claimed the wallet. *Id.* at 584. The court rejected the defendant's argument that, "because Storie [the store owner] was not an expert in drug identification and the officer knew that she was not such an expert, the officer could not reasonably rely on Storie's statement that she saw cocaine, at least without further inquiry." *Id.* at 585. In concluding that the police officer had reasonable suspicion to stop the defendant, the court explained:

> "People often speak in the shorthand of opinions or conclusions, not in the form of a recitation of pure fact. There was evidence presented in this case that members of society have a general knowledge regarding the appearance of cocaine. Storie testified that she believed that the powdery substance in the bag that she saw was cocaine because of her knowledge as to the appearance of cocaine from '[w]atching the news, [and] watching t.v. programs. You see it every day on the news.' When Storie, a named informant, told [Officer] Derby that she saw 'a bag of coke,' she was

saying that she saw a transparent bag, small enough to be put in a wallet, that contained a white powdery substance. Having heard that statement, it was reasonable for Derby to add his *own* expertise concerning the way illegal drugs are carried and to infer that the white powdery substance could be cocaine. Defendant and his companion then drove up and claimed the right to possess the wallet. These facts gave Derby a reasonable suspicion that defendant's wallet contained cocaine and that defendant therefore was committing a crime."

*Id.* (emphasis in original).

Finally, in *State v. Ehly*, 317 Or 66, 854 P2d 421 (1993), police officers who were called to a motel recognized the defendant, an unruly guest, as a convicted felon and ordered him to back away from a gym bag that he was reaching into. The state conceded, and the court agreed, that the defendant "was stopped and thus was 'seized' when Corporal Cleaves put her hand on her gun and ordered defendant to 'back up,' and he submitted to that show of police authority." *Id.* at 79. The court explained its conclusion that the officers had reasonable suspicion to justify the stop:

"Applying the reasonable suspicion standard to the facts in this case, the specific and articulable facts that support the officers' reasonable inference that defendant had committed a crime are the following: Immediately before Corporal Cleaves put her hand on her gun and ordered defendant to 'back up,' the officers were confronted by a person whom they knew had prior felony convictions, whom they knew to be a methamphetamine user, and who appeared at that time to be under the influence of methamphetamine. Corporal Cleaves knew that many people who use illegal narcotics possess guns. When she saw defendant reaching into the gym bag with both his hands concealed, she thought that he had a gun. The officer knew that defendant was a friend of Gene Gammond and that defendant and Gammond were 'running together.' They also had reason to believe that Gammond was armed with an automatic handgun, and they had seen him drive out of the motel parking lot only minutes earlier. The officers reasonably could have believed that the gym bag belonged to Gammond and that it contained Gammond's automatic handgun. The gym bag was large enough to have contained a weapon. When Officer Emerson asked defendant why he

did not just dump the gym bag's contents on the bed and look for the key, defendant did not respond. Moreover, after telling the officers that the gym bag was not his, defendant continued to rummage through the gym bag with both his hands concealed. Considering the totality of those circumstances, we conclude that Corporal Cleaves had an objectively reasonable suspicion that defendant had committed the crime of felon in possession of a firearm."

*Id.* at 80-81 (footnote omitted).

In concluding that the officers reasonably suspected criminal activity, the court observed that "[w]hether the suspicion is reasonable often will depend on the inferences drawn from the particular circumstances confronting the officer, viewed in the light of the officer's experience." *Id.* at 80 (citing *Terry*, 392 US at 21-22, 27-30). The court made its determination based on the "specific and articulable facts that support[ed] the officer's reasonable inference that defendant had committed a crime." *Id.* The court concluded that the officers "held a belief that was objectively reasonable *under the totality of the circumstances* existing at that time and place, that defendant had committed a crime."[4] *Id.* at 79 (emphasis added).

To summarize: The people have a liberty interest to be free from unreasonable searches and seizures that is

---

[4] That standard mirrors the rationale of *Terry*:

"[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate? Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction. And simple good faith on the part of the arresting officer is not enough. *** If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be secure in their persons, houses, papers, and effects, only in the discretion of the police."

392 US 21-22 (footnotes, internal citations, and internal quotation marks omitted; omission in original).

protected by provisions of the Oregon and federal constitutions. The standard of "reasonable suspicion" justifying a police intrusion on that liberty interest when a person is stopped was intended to be less than the standard of probable cause to arrest. A stop is unlawful unless it meets an objective test of reasonableness based on observable facts. Officer intuition and experience alone are not sufficient to meet that objective test. However, if an officer is able to point to specific and articulable facts that a person has committed a crime or is about to commit a crime, the officer has a "reasonable suspicion" and may stop the person to investigate.

B. *Officer Salang's Reliance on Information from Other Officers*

With the above understanding in mind, we turn to the specific questions before us on review. We begin with our first question: Could Officer Salang, in stopping defendant, rely on the factual information provided to him by other police officers to establish reasonable suspicion?

As previously mentioned, Officer Salang relied on information provided to him by Detective Davis, who had observed defendant as a passenger in a blue SUV driven by Wattsr. Davis was familiar with Watts as a current suspect in an ongoing investigation of a local methamphetamine distribution ring. Davis also knew that Watts was wanted on an outstanding warrant for violating parole following a felony conviction. Davis put out a call to alert officers that Watts should be pulled over, and he provided the above background information to Salang, who responded to the call and pulled Watts over after he observed Watts commit a traffic infraction.

The trial court concluded that Salang had reasonable suspicion to stop defendant for a suspected drug crime.[5] Thus, the trial court implicitly credited the information from Davis that Salang relied upon as part of the totality of the circumstances justifying the stop. The Court of Appeals,

---

[5] The trial court did not make detailed findings of fact on the issue of Salang's reasonable suspicion. However, as we explain, the findings made by the trial court were sufficient to support its conclusion that the stop was justified by reasonable suspicion.

however, rejected that information from Davis and the other officers:

> "[W]e conclude that Salang did not have reasonable suspicion that defendant was involved in criminal activity at the time he was stopped. The only fact cited by Salang that relates to defendant himself, as opposed to the SUV or Watts, is his nervous, fidgety demeanor. \*\*\* And as for Watts and the extent to which being in his proximity might indicate ongoing criminal activity by defendant, it is significant that the only criminal activity that Salang *knew* Watts was engaged in was being in violation of his parole. He apparently had heard second-hand information that Watts was suspected of methamphetamine distribution. The information about the parking-lot drug transaction was something that Salang heard from Davis who heard it from a third officer who was not even certain about what he had seen. The information about the SUV was similarly indirect and speculative."

*Holdorf*, 250 Or App at 514-15 (emphasis in original).

Read strictly, the above analysis appears to reject any information pointing to criminal activity that did not "relate[] to defendant himself" or was not personally observed by Officer Salang. *Id.* at 514. However, our case law does not require such a truncated approach to judicial review for "reasonable suspicion." Rather, our case law requires an objective review of observable facts to determine whether a police stop is justified by "reasonable suspicion." That judicial review looks to the totality of the circumstances confronting a police officer and not just those circumstances that directly relate to a suspect or are personally observed by the police officer stopping a suspect.

In considering the totality of the circumstances confronting them, police officers often reasonably rely on information provided to them by other officers to determine whether to stop a suspect. We have recognized that there are circumstances where a police officer may act based on the shared knowledge of the police when effectuating an arrest:

> "The collective knowledge doctrine focuses on the shared knowledge of the police as a unit rather than merely on the knowledge of the officer who acts. The doctrine therefore

permits a police officer to act if the officer reasonably relies on instructions from an officer who has probable cause."

*State v. Soldahl*, 331 Or 420, 427, 15 P3d 564 (2000). That recognition "in no way undermines the probable cause requirement. The doctrine merely views law enforcement agencies as a unit." *Id.* at 428. We hold that the collective knowledge doctrine also applies when a police officer reasonably relies on information from other officers in making a determination that a stop is justified based on articulable facts that criminal activity is afoot. *See generally Lichty*, 313 Or at 585 (totality of circumstances considered by police officers included reasonable reliance on information from informant).

To be sure, a court must ultimately determine whether a police officer has "point[ed] to specific and articulable facts that give rise to a reasonable inference that a person has committed [or is about to commit] a crime" to justify a stop. *Ehly*, 317 Or at 80. However, courts must consider the "totality of the circumstances" confronting an officer in making that determination. *Id.* at 79. Thus, the Court of Appeals erred to the extent that it did not consider the information that Salang had received from other officers as circumstances to weigh in its ultimate determination of whether there was reasonable suspicion for Salang to stop defendant. That information included the shared knowledge of Davis and other officers about Watts and the SUV. *See Soldahl*, 331 Or at 427.

C.  *Officer Salang's Opinion That Defendant was Under the Influence of Methamphetamine*

We now turn to our second question on review: Was Officer Salang's observation that defendant appeared to be under the influence of methamphetamine, based on his training and experience, together with other information on which the officer properly relied, sufficient to establish a reasonable suspicion that defendant had or was about to commit a crime?

As mentioned, Officer Salang testified that, in his opinion, defendant was under the influence of methamphetamine at the time of the stop. Salang stated that defendant

was nervous and fidgety, avoided eye contact with him, and looked like he was "tweaking":

> "Q.   And do you make any—you identify that he's male, any other things that you recognize or that you notice about the passenger?
>
> "A.   He was appearing very nervous when I first contacted him, making minimal eye contact with myself when I was talking to Mr. Watts at first, and then when I'd talk to him. He was very fidgety.
>
> "Q.   Fidgety?
>
> "A.   Yeah.
>
> "Q.   When *** making eye contact, not making eye contact, describe that for us, what you mean by he's not making eye contact. Is it—is it out of the ordinary?
>
> "A.   It's out of the ordinary when you speak to a person for them not to look at you. He kept kind of looking down or straight when I was asking him for his name. Kind of would just look at me for a second and then look away. I also noticed that his hands were—he was kind of doing this (*indicating*) a little bit, which appeared—for me it appeared that he was nervous about something.
>
> "Q.   Did he appear to be under the influence of methamphetamine?
>
> "A.   Yes.
>
> "Q.   You used previously the term 'tweaking'?
>
> "A.   Mmm-hmm.
>
> "Q.   Did it appear he was tweaking?
>
> "A.   Yes."

Officer Salang also testified about his training and experience as a police officer and, in particular, about his experience with users of methamphetamine:

> "Q.   Can you give us a thumbnail sketch of your background, training and experience in law enforcement?
>
> "A.   I've been with the Albany Police Department for almost five years. I am now a school resource officer. Prior to that I was a patrol officer for about four and

a half years. Prior to being a patrol officer, I was a corrections deputy for Lincoln County for almost two years serving in the jail. Prior to that about ten years experience in juvenile corrections in different capacities as a juvenile probation officer, detention worker, and various types of work.

"Q. And in each of those jobs have you come in contact on a fairly regular basis with people who possess methamphetamine, may be under the influence of methamphetamine, and are you familiar with the patterns and practices of methamphetamine dealing and possession and use?

"A. Yes, both in my patrol duties and corrections when they come in in the booking.

"Q. And what kinds of behaviors do you see when you see someone who is under the influence of methamphetamine?

"A. Someone that might be fidgety, we have a term, *tweaking*, someone that might not have been sleeping for days because of the [*sic*] under the influence of the methamphetamines.

"Q. Is it a pretty distinct look?

"A. Yes."

By concluding that Officer Salang's stop of defendant was supported by reasonable suspicion, the trial court implicitly credited Salang's observations of defendant's distinct behavior and Salang's training and experience related to methamphetamine use by criminal suspects.[6] Those were articulable facts that the court considered along with other specific and articulable facts relating to Watts, a current suspect in an ongoing investigation of a local methamphetamine distribution ring.

---

[6] In addition to testifying that defendant's behavior, particularly defendant's "tweaking," was consistent, based on Salang's training and experience, with the behavior of methamphetamine users that he had previously observed, Salang gave his opinion that defendant was under the influence of methamphetamine at the time of the stop. That opinion was received by the trial court without objection. Therefore, Salang's competency as a witness to give that opinion was not raised as a contested issue in this case.

From its inception, the "reasonable suspicion" standard has included a proper regard for the experience that police officers bring with them when they encounter criminal suspects. The "reasonable suspicion" standard applies to a police officer acting in his or her official capacity when stopping a person that the officer reasonably suspects "has committed or is about to commit a crime." ORS 131.615(1); *see also* ORS 131.605 (peace officer defined as the meaning given in ORS 133.005). This court has quoted the following from the commentary to the final draft of the Proposed Oregon Criminal Procedure Code:

> "'*** [W]hen an officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity is afoot* and when he is able to point to specific and articulable facts which give rise to the inference that criminal activity is afoot, the officer has 'reasonable suspicion' and hence can stop the individual for investigation.'"

*Valdez*, 277 Or at 626 (emphasis added).

Indeed, this court has expressly stated that "[w]hether [a police officer's] suspicion is reasonable often will depend on the inferences drawn from the particular circumstances confronting the officer, viewed in the light of the officer's experience." *Ehly*, 317 Or at 80 (citing *Terry*, 392 US at 21-22); *see also id.* at 79 (totality of circumstances for officers included observation that suspect appeared to be under the influence of methamphetamine); *Lichty*, 313 Or at 585 ("Having heard that statement [from an informant], it was reasonable for [Officer] Derby to add his *own* expertise concerning the way illegal drugs are carried and to infer that the white powdery substance could be cocaine." (Emphasis in original.)).

Further, this court has given weight, as appropriate in criminal cases, to officer's training and experience when we have reviewed probable cause determinations. *See State v. Heckathorne*, 347 Or 474, 485, 223 P3d 1034 (2009) ("[The] individual expertise and training [of a police officer] may provide the knowledge that turns various sensory clues into probable cause."); *State v. Goodman*, 328 Or 318, 328, 975 P2d 458 (1999) (police officer's training and

experience in drug investigations contributed to necessary factual nexus between a residence, the defendant, and a remote marijuana grow location in establishing probable cause for search); *State v. Herbert*, 302 Or 237, 243, 729 P2d 547 (1986) (police officer, based upon his experience, had probable cause to believe that a paperfold contained contraband); *State v. Westlund*, 302 Or 225, 231-32, 729 P2d 541 (1986) (same with respect to police officer's belief that a vial contained a controlled substance). We conclude that a police officer's training and experience may, depending on the factual circumstances, also be given appropriate weight when a stop is reviewed under the less exacting standard of "reasonable suspicion."

How much weight a reviewing court will give to a police officer's training and experience in assessing the officer's testimony in such a review will, of course, depend on the circumstances of each case. We emphasize that a police officer's training and experience, as relevant to proving particular circumstances, is not presumed based solely upon a police officer's employment status. Rather, that training and experience must be established, as it was here, through admissible evidence of specific articulable facts that permit an officer to make a reasonable inference based on the officer's pertinent training and experience.

### III.   CONCLUSION

Here, Officer Salang testified that defendant was nervous and fidgety and avoided eye contact. Salang also testified that, in his substantial experience as a police officer, he had observed a distinctive behavior associated with methamphetamine use that is popularly referred to as "tweaking" and that, in his opinion, defendant was tweaking. Salang also testified that another police officer had told him that the driver of the blue SUV in which defendant was riding was a known felon with an outstanding warrant who was under investigation as a suspect in a local methamphetamine distribution ring.[7] We conclude that the above facts, considered in their totality, gave rise to a reasonable

---

[7] We agree with the Court of Appeals that Officer Fandrem's explanation that he had observed an occupant of the same SUV engage in an apparent drug deal two weeks earlier is too speculative to be considered in this analysis.

inference that defendant committed the crime of possession of methamphetamine, ORS 475.894. Thus, Salang's stop of defendant was justified by "reasonable suspicion." *See Ehly*, 317 Or at 80.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.