Submitted March 28, affirmed June 15, petition for review denied
November 17, 2016 (360 Or 604)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## BOURNE P. HUDDLESTON,
*Defendant-Appellant.*

Jackson County Circuit Court
121371FE; A157029

375 P3d 583

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Stephanie J. Hortsch, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Paul L. Smith, Deputy Solicitor General, and Timothy A. Sylwester, Assistant Attorney General, filed the brief for respondent.

Before Armstrong, Presiding Judge, and Egan, Judge, and Shorr, Judge.

**SHORR, J.**

A jury convicted defendant of, among other things, two counts of attempted aggravated murder, ORS 163.095 (Counts 2 and 6), and one count of intentional murder, ORS 163.115(1)(a) (Count 1). On appeal, defendant raises two assignments of error, which both present the same issue of whether the trial court erred in failing to merge the convictions for attempted aggravated murder with the conviction for intentional murder. Defendant argues that, under ORS 161.485(2), he cannot be convicted of more than one count of attempted aggravated murder. Defendant further contends that, under ORS 161.485(3), the convictions for the inchoate offenses of attempted aggravated murder must merge with the conviction for the completed murder. As explained below, we conclude that the trial court did not err in declining to merge the two convictions of attempted aggravated murder with each other or with the conviction for intentional murder because defendant's criminal acts did not constitute a single course of conduct. Thus, we affirm the trial court's judgment.

We are bound by the trial court's findings of fact if they are supported by evidence in the record. *State v. Holdorf*, 355 Or 812, 814, 333 P3d 982 (2014). We review the trial court's merger of convictions at sentencing for errors of law. *State v. Badillo*, 260 Or App 218, 224, 317 P3d 315 (2013) (citing *State v. Colmenares-Chavez*, 244 Or App 339, 342, 260 P3d 667, *rev den*, 351 Or 216 (2011)).

The following material facts are supported by the record. Defendant was married to the victim, and they had a son, E. Defendant was having an affair with Roberts, of which the victim was aware. Defendant was enrolled as a full-time student at Rogue Community College and was in the paramedics program. He was taking an EMT class with his friend, Yorrie. In early November 2011, defendant and Yorrie were on a 15-minute break from their EMT class, when defendant told Yorrie that he "could not stand [the victim] and just wanted her gone." He offered Yorrie $20,000 to kill her. Defendant outlined a detailed plan to have Yorrie kill the victim in the morning as she was headed to work. Defendant wanted the shooting to appear as an "armed

robbery gone bad." He planned to pay Yorrie from the proceeds of the victim's life insurance policy. Yorrie declined defendant's offer, but arranged for defendant to meet his cousin at a McDonald's in White City.

Around Thanksgiving 2011, defendant met with Yorrie's cousin, Nuckolls, and defendant offered to pay Nuckolls $20,000 to kill the victim. Defendant articulated a plan to have Nuckolls lie in wait in a field near the victim's home with a sniper rifle and shoot her as she was leaving her home. Defendant discussed an alternative plan to have Nuckolls shoot the victim at point-blank range as she was going up the stairs into her home. Nuckolls told defendant that he would consider the offer. Eventually, Yorrie and Nuckolls met defendant in a parking lot behind a Superior Athletic Gym, where Nuckolls declined defendant's offer. Defendant responded, "Either way I'm going to get it done. I'll find somebody else. It doesn't matter." Neither Nuckolls nor Yorrie took any steps toward killing the victim. Instead, defendant offered to pay Yorrie $5,000 in exchange for an alibi, if defendant ended up committing the murder.

On the night of March 22, 2012, defendant was assisting Yorrie with a project for one of his classes at Roberts's house. Defendant left Roberts's home to run some errands and asked Roberts and Yorrie not to call or text him while he was out. At around 3:00 a.m. on the morning of March 23, 2012, E, who was 10 years old at the time, was awakened by a scream. E saw defendant, his father, leave his parents' bedroom, walk out to his truck with a gun, and drive away. E entered his parents' bedroom and found the victim lying on her bed covered in blood. He called 9-1-1 and followed the operator's instructions on how to perform CPR. The victim died shortly after the paramedics arrived.

Meanwhile, Roberts finished the class project with Yorrie and drove him home. About an hour later, at 2:40 a.m., defendant called Yorrie. Defendant told Yorrie, "Hey I'm going to make front line * * * newspaper. You earned your five grand." Yorrie initially provided an alibi to detectives, claiming that defendant never left Roberts's house, but eventually retracted it.

Investigators traced defendant's phone to Roberts's home and arrested defendant. There, in the bushes, they found parts of the pistol used to shoot the victim and latex gloves in defendant's truck. Detectives brought defendant to the Jackson County Sheriff's office for questioning. Defendant told detectives that, on the night the victim died, he had had an argument with the victim in their bedroom regarding his extramarital affair with Roberts. He claimed that, after he left and shut the door, he heard a gunshot from within the bedroom. At trial, defendant claimed that the victim committed suicide. A medical examiner, who performed an autopsy on the victim, concluded that she was shot at a distant range, and he classified the manner of her death as a homicide.

The jury convicted defendant on all 10 counts charged in the indictment.[1] At sentencing, the trial court initially merged the convictions on several inchoate offenses (Counts 2 to 9) with the murder conviction (Count 1). The trial court imposed a sentence of 25 years' imprisonment on the murder conviction and 30 days in jail on a conviction for unlawful possession of a firearms silencer (Count 10). At some point following the sentencing hearing, the trial court determined that resentencing was necessary, but the record does not reveal why. At the resentencing hearing, the following colloquy occurred regarding merging the inchoate convictions:

"[PROSECUTOR]:   [B]ased on my sentencing memorandum, under *Badillo* neither one of the Attempted Aggravated Murders, they were with sufficient pause, should merge into each other.

"THE COURT:   Well that wasn't even a Murder case.

"[PROSECUTOR]:   I know.

"THE COURT:   *Badillo* was a kidnapping case.

---

[1] Defendant was charged with the following: Count 1, murder; Count 2, attempted aggravated murder; Count 3, solicitation to commit aggravated murder; Count 4, attempted murder; Count 5, solicitation to commit murder; Count 6, attempted aggravated murder; Count 7, solicitation to commit aggravated murder; Count 8, attempted murder; Count 9, solicitation to commit murder; Count 10, unlawful possession of a firearms silencer. Counts 2 to 5 address defendant's conduct in approaching Yorrie to kill the victim in exchange for $20,000. Counts 6 to 9 address defendant's conduct in approaching Nuckolls to murder the victim.

"[PROSECUTOR]: But you have the two Attempted Aggravated Murders versus the two Attempted Kidnappings. There was a pause in those and they didn't merge.

"THE COURT: Yeah, but there was no completed kidnapping, that's the difference.

"[PROSECUTOR]: No, it wasn't a completed kidnapping, but the two Attempted Aggravated Murders are not lesser included of the Murder and they said there was sufficient pause in that so that those two did not merge together even though they were closely related in time. This is a pause of months between those actual solicitation attempts and the completed murder. And the murder was completed by someone who wasn't solicited or—yes, solicited, that's the right term for this, to do the murder. So it's completely separate."

Following that exchange, defendant argued that Yorrie's ongoing communication and relationship with defendant, from defendant's initial solicitation of Yorrie to shoot the victim to defendant's eventual decision to kill her himself, entailed a single course of conduct. The trial court disagreed with defendant and entered the following sentence as requested by the state.

The trial court merged the convictions for solicitation to commit aggravated murder (Count 3), attempted murder (Count 4), solicitation to commit murder (Count 5), solicitation to commit aggravated murder (Count 7), attempted murder (Count 8), and solicitation to commit murder (Count 9) with the murder conviction (Count 1), and sentenced defendant to 25 years' imprisonment. The trial court then entered separate convictions for attempted aggravated murder (Counts 2 and 6) and ordered a sentence of 120 months' imprisonment on each of those convictions to run consecutively to each other and to the sentence on the murder conviction. Finally the trial court entered a sentence of 30 days' jail time on the conviction for unlawful possession of a firearms silencer (Count 10).

On appeal, defendant's assignments of error are based on two main arguments. First, defendant argues that the two convictions for attempted aggravated murder must merge under ORS 161.485(2), which prohibits more than

one conviction for an inchoate offense designed to culminate in the same crime. Second, defendant argues that the convictions for the inchoate offenses of attempted aggravated murder must merge with the completed murder under ORS 161.485(3). The state responds that the two convictions for attempted aggravated murder do not merge under ORS 161.485(2) because there was a significant lapse in time between those inchoate offenses. Further, the state contends that the convictions for attempted aggravated murder do not merge with the intentional murder conviction under ORS 161.485(3) because defendant engaged in different courses of conduct when he attempted to hire someone else to kill the victim than when he later killed her himself. For the reasons detailed below, we agree with the state.

ORS 161.485(2) provides that "[a] person shall not be convicted of more than one offense defined by ORS 161.405 [attempt], 161.435 [solicitation] and 161.450 [conspiracy] for conduct designed to commit or to culminate in commission of the same crime." We have summarized the legislature's intention in passing ORS 161.485(2) as "to prevent multiple convictions for attempt, solicitation, and conspiracy on the basis of defendant's *single course of conduct,* as opposed to preventing multiple convictions for multiple instances of one or another of the inchoate crimes." *Badillo,* 260 Or App at 227 (emphasis added). Thus, in order for convictions for inchoate offenses to merge under ORS 161.485(2), defendant's actions must constitute a single course of conduct aimed at the commission of the same crime. Determining whether defendant engaged in a single course of conduct requires a close factual analysis, including whether there existed unity of time, location, act, and intent. *State v. Cloutier,* 286 Or 579, 597, 596 P2d 1278 (1979).

Our recent interpretation of ORS 161.485(2) in *Badillo* is controlling. In that case, the defendant was convicted of two counts of solicitation to kidnap her neighbor's infant daughter. The defendant separately approached an acquaintance and an undercover trooper and offered to pay each of them to perform the kidnapping. The defendant in that case argued that those inchoate convictions should be merged under the statute because they were "designed to perpetrate the same primary crime." *Badillo,* 260 Or App at

224. In *Badillo*, we concluded that the defendant's conduct of soliciting two individuals several days apart to kidnap her neighbor's infant constituted two separate commissions of the same inchoate crime.

Defendant argues that *Badillo* turned on our analysis of the solicitation statute, ORS 161.435(1), in which we found that approaching "another person" to commit a crime was a material element of the solicitation offense. In this case, defendant argues that our analysis in *Badillo* is inapplicable because the attempt statute, ORS 161.405, does not contain a similar "another person" element, and that therefore the fact that defendant approached two different individuals to kill the victim is immaterial to our merger analysis here. However, our analysis of defendant's conduct requires us to consider the applicable merger statute and the specific crime with which defendant was charged, including both the attempt and aggravated murder statutes.[2] Taken together, those statutes require us to consider whether defendant engaged in a single course of conduct that constituted a substantial step toward the commission of aggravated murder. Under ORS 163.095(1)(b), "aggravated murder" includes murder where the "defendant *solicited another* to commit the murder and paid or agreed to pay the person money or other thing of value for committing the murder." (Emphasis added.) Because this theory of aggravated murder hinges upon the solicitation of "another" to commit murder, our analysis in *Badillo* is directly on point. Thus, under ORS 163.095(1)(b), the person solicited is a material element of the aggravated murder statute when the only aggravating factor involves a murder-for-hire plan and, accordingly, is relevant in our determination of whether defendant engaged in a single course of conduct.

Additionally, the state emphasizes that the amount of time between the solicitations was a factor in our analysis in *Badillo*. In that case, we determined that the defendant's solicitations of two different people several days apart was designed to culminate in separate commissions of kidnapping.

---

[2] ORS 161.405(1) defines attempt as when a "person intentionally engages in conduct which constitutes a substantial step toward commission of the crime."

Applying our analysis in *Badillo* to this case, defendant's separate solicitations of two different individuals weeks apart leads us to conclude that defendant committed two acts of attempted aggravated murder: first, when he approached Yorrie with his murder-for-hire plan and, second, when he approached Nuckolls weeks later with a similar plan. Each of those crimes was complete when defendant, weeks apart, offered to pay each individual $20,000 in exchange for the victim's murder. Therefore, the trial court did not err when it declined to merge the convictions for attempted aggravated murder (Counts 2 and 6).

Next, we address defendant's second argument that, regardless of our analysis under *Badillo*, the two inchoate offenses of attempted aggravated murder must merge with the completed murder under ORS 161.485(3). Defendant relies on *Cloutier* for the proposition that all inchoate offenses should merge with the actual commission of a "planned crime." 286 Or at 597. The state counters that defendant did not engage in the same course of conduct when he killed the victim himself because his original plan was to have someone else kill her. We agree with the state.[3]

ORS 161.485(3) provides that "[a] person shall not be convicted on the basis of the same course of conduct of both the actual commission of an offense and an attempt to commit that offense." For the convictions of the inchoate offenses to merge with the completed offense, defendant must have engaged in a single course of conduct aimed at committing the same offense. Similar to our analysis under ORS 161.485(2), to determine whether defendant engaged in the same course of conduct, we are required to consider the facts underlying the commission of the inchoate offense and the completed offense.

Testimony at trial indicated that defendant's initial plan was to have Yorrie shoot the victim on her way to work to appear as an "armed robbery gone bad." Defendant then approached Nuckolls with a plan to have the victim killed from a distance as she was climbing the stairs outside of her

[3] The state also argues that the attempted aggravated murder convictions cannot merge with the intentional murder conviction because these convictions do not involve the same offense. Our disposition obviates the need to address that argument.

home. Eventually, defendant killed her himself and staged the shooting as if she committed suicide. Defendant's various plans necessitated separate actions when he attempted to hire someone else to kill the victim and, months later, when he ultimately killed her himself. As a result, his actions do not constitute the same course of conduct under ORS 161.485(3).

We conclude that the trial court did not err in declining to merge defendant's two convictions for attempted aggravated murder under ORS 161.485(2), because defendant engaged in separate and distinct criminal acts when he solicited two individuals several weeks apart to kill the victim, resulting in multiple commissions of the same inchoate offense. Additionally, the trial court did not err in deciding that defendant's convictions for attempted aggravated murder do not merge with his conviction for intentional murder, because defendant formulated and executed different plans when he attempted to hire someone else to murder the victim as opposed to when, months later, he killed her himself. Therefore, defendant did not engage in the same course of conduct when he committed the inchoate offenses and the substantive offense under ORS 161.485(3). Accordingly, we affirm the trial court's decision not to merge the convictions for attempted aggravated murder and not to merge those convictions with the intentional murder conviction.

Affirmed.