Argued and submitted November 24, 2015; in Case Number 110036CR, reversed and remanded, in Case Number 130216CM, affirmed September 28, 2016

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

BRIAN ROY SNYDER,
*Defendant-Appellant.*

Hood River County Circuit Court
110036CR, 130216CM;
A156405 (Control), A156406

383 P3d 357

Kyle Krohn, Deputy Public Defender, argued the cause for appellant. With him on the opening brief was Peter Gartlan,

Chief Defender, Office of Public Defense Services. With him on the reply brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section.

Timothy A. Sylwester, Assistant Attorney General, argued the cause for respondent. With him on the brief was Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Sercombe, Presiding Judge, and Tookey, Judge, and Garrett, Judge.

**SERCOMBE, P. J.**

Defendant appeals a judgment of conviction in Case Number 110036CR for one count of possession of methamphetamine, ORS 475.894, and one count of delivery of methamphetamine, ORS 475.890.[1] Defendant assigns error to the denial of his motion to suppress, contending that the trial court should have suppressed the evidence seized from a car because the police lacked probable cause to support the search of the car under the "automobile exception" to the warrant requirement and, alternatively, because the search was the product of an unlawful extension of a traffic stop. The state responds that the evidence was properly admitted because there was probable cause for the search. Further, the state asserts that defendant may not challenge the extension of the traffic stop because he was a passenger in the car and, in all events, any extension of the stop was lawful. On review for errors of law, *State v. Holdorf*, 355 Or 812, 814, 333 P3d 982 (2014), we conclude that the police lacked probable cause to search the car. We therefore do not reach defendant's challenge to the extension of the stop. Accordingly, the trial court erred in denying defendant's motion to suppress, and we reverse and remand.[2]

"In reviewing a denial of a motion to suppress, we are bound by the trial court's findings of historical fact that are supported by evidence in the record." *Id.* To the extent that the trial court did not make findings of fact, and where there are facts that could be decided in more than one way, we presume that the court made factual findings consistent with its ultimate conclusion. *Id.* We state the facts in accordance with those standards.

While he was on patrol on Interstate 84, Oregon State Trooper Calloway observed a white automobile that did not have a front license plate. Calloway activated his overhead lights and stopped the car. During the stop, Calloway

---

[1] Defendant also appeals a judgment in Case Number 130216CM finding him in contempt of court, but he raises no assignments of error related to that judgment, and we therefore affirm.

[2] That disposition obviates the need to address defendant's second assignment of error, asserting that the trial court erroneously imposed attorney fees without evidence of defendant's ability to pay.

became suspicious that the driver and registered owner of the car, Crier, and the passenger, defendant, had drugs in the car. His suspicion was based on several observations, including their "furtive movements" at the beginning of the stop, the presence of multiple air fresheners in the car, their nervousness throughout the encounter, and his knowledge that each had a history of drug use.

Calloway questioned Crier and defendant about whether there were drugs in the car and about their movements that day. Both denied having any drugs in the car. Additionally, Crier offered a convoluted story about their whereabouts that day, which Calloway did not find believable. Defendant, in contrast, would not "explain anything about what they" had done that day.

Calloway returned to his patrol car. He checked Crier's and defendant's driving records and warrants statuses. He learned that Crier's license was suspended, and he wrote her a citation for driving while suspended. He also learned that defendant had several drug-related convictions. Calloway then requested that a drug-detection dog be deployed to the stop.

Calloway returned to Crier's car and issued her the citation. He also explained to Crier that she was not free to leave until the drug-detection dog arrived and sniffed the exterior of the car. Crier asked if defendant would be allowed to drive the car away at the end of the stop, and Calloway told her that he would.

The drug-detection dog, Quincy, arrived with Trooper Raiser, Quincy's handler, and Trooper Holloran. Calloway asked defendant to get out of the car to allow the drug-detection dog to sniff the car, and he told defendant to stand with Holloran near the front of the car.

Raiser walked Quincy around the car, and Quincy "alerted" by the passenger-side door, changing his behavior in a manner that indicated the presence of drugs in the car. Raiser then opened the car door to allow Quincy to enter the passenger seat, where he alerted again. Raiser and Calloway proceeded to search the car, discovering a makeup bag under the passenger seat. Inside the bag, they discovered a

small quantity of methamphetamine and a pipe. They also searched the trunk of the car, where they found a tool box. Upon opening the tool box, the troopers discovered "individual[ly] packaged methamphetamine and scales and everything for distribution of methamphetamine for sale."

At some point while he was standing with Holloran, defendant attempted to surreptitiously drop a baggie containing methamphetamine on the ground. Holloran saw defendant drop the baggie and placed him under arrest. The trial court's findings of fact state that defendant dropped the baggie "[d]uring the search" of the car.

Subsequently, defendant was charged with possession, manufacture, and delivery of methamphetamine. Defendant filed a motion to suppress the evidence discovered during the search of Crier's car, as well as the methamphetamine that he dropped on the ground in front of Holloran. In his written memorandum, defendant argued that the evidence discovered in the car should be suppressed, because it was the product of an unlawful extension of the traffic stop beyond the time necessary to complete the traffic citation, and it was also the product of an unlawful search of the car. Additionally, defendant contended that the evidence of the methamphetamine that he dropped on the ground should be suppressed because it was a product of an unlawful seizure.

At the hearing on the motion to suppress, Calloway, Raiser, and Holloran testified to the facts stated above. Additionally, Raiser testified about his training and that of Quincy. Raiser stated that he had undergone "special training" to be a drug-detection dog handler. He explained that he had been working with Quincy for about a year and had deployed with the dog between 20 and 50 times. Raiser also testified that Quincy was trained to detect the odors of marijuana, heroin, cocaine, and methamphetamine, and he considered Quincy to be a reliable drug-detection dog. When Raiser testified about Quincy's "alert" at the passenger-side door of the car, defendant objected on "foundation" grounds, but the trial court overruled the objection.

At the close of the hearing, the state argued that defendant could not challenge the search of the car because he did not own the car and, therefore, had no constitutionally

protected privacy interest in it. In the alternative, the state argued that Quincy's alert provided probable cause to search the car, making the search permissible under the automobile exception to the warrant requirement. Further, the state contended that, as a passenger, defendant was not seized at the beginning of the traffic stop and could not challenge its extension and that, regardless, the police had reasonable suspicion to extend the stop. Finally, the state asserted that the evidence of the methamphetamine that defendant dropped need not be suppressed, because defendant had freely chosen to abandon it, regardless of any unlawful conduct by the police.

Defendant responded that he could assert a privacy interest in the car because he had never disclaimed any interest in it. Defendant further argued that Raiser's testimony was inadequate to show that Quincy's alert provided probable cause for the search. Defendant also contended that he was seized at the outset of the traffic stop, and the extension of the stop was unlawful. Additionally, defendant contended that, under the circumstances of the case, his decision to drop the methamphetamine was a product of his unlawful seizure, requiring suppression of that evidence as well.

The trial court denied the motion to suppress. First, the court "adopt[ed]" the "facts" section of defendant's memorandum in support of his motion to suppress as its findings of fact, stating that "[d]efendant's statement of facts is an objective statement of the evidence." Next, the court concluded that, because he was a passenger, "defendant's Article I, section 9, [of the Oregon Constitution] rights were not violated" by search of the car or by any illegality in the extension of the stop. The court also ruled that evidence of the drugs that defendant dropped did not need to be suppressed, because defendant had abandoned any interest in the baggie of methamphetamine when he dropped it on the ground.

Following the denial of his motion, defendant was tried to a jury and convicted of possession of methamphetamine and delivery of methamphetamine. He was acquitted of manufacture of methamphetamine.

On appeal, defendant largely reiterates the arguments that he made in the trial court with respect to the search of the car. However, he does not assign error to the court's ruling admitting the evidence of the methamphetamine that he dropped while standing with Holloran.[3] As to the search of the car, defendant disputes the trial court's conclusion that it did not violate his rights under Article I, section 9. Relying on our decision in *State v. Silva*, 170 Or App 440, 13 P3d 143 (2000), he claims that a passenger in a car has "'a protected interest' in the contents of the car," which enables the passenger to contest an unlawful search.

Article I, section 9, protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]" That provision is "predicated on the personal right of a criminal defendant to be free from an 'unreasonable search, or seizure,'" and it is not implicated unless the actions of the police interfere with that personal right. *State v. Tanner*, 304 Or 312, 315-16, 745 P2d 757 (1987). Thus, suppression of evidence obtained through a search is not required under Article I, section 9, unless the search violated the defendant's personal rights by interfering with his or her protected "privacy interests." *Id.* at 319-22; *see also State v. Makuch/Riesterer*, 340 Or 658, 670, 136 P3d 35 (2006) (defendants could not challenge the searches of their lawyer's home or their lawyer's personal organizer under Article I, section 9, because, even if the searches were unlawful, they had no "possessory or privacy interest" in either).

Although the state argued in the trial court that defendant had no privacy interest in the car, the state has abandoned that position on appeal. Moreover, we have previously determined that passengers have some protected privacy interests in another person's car and the contents of that car. *See Silva*, 170 Or App at 446 (explaining that, in *State v. Tucker*, 330 Or 85, 997 P2d 182 (2000), the Supreme Court "rejected the * * * argument that 'a passenger

---

[3] Defendant also reasserts his contention that the evidence discovered in the search was a product of an unlawful extension of the traffic stop, but, because his challenge to the validity of the search of the car is dispositive, we do not address the lawfulness of the extension of the stop.

in an automobile has no protected privacy or property interest in the automobile or its contents,'" and concluding that defendant-passenger had a protected privacy interest under Article I, section 9 (quoting *Tucker*, 330 Or at 88)); *Tucker*, 330 Or at 87, 90-91 (state failed to prove that defendant had no privacy interest in property that he left in a third party's car, even though defendant neither owned nor controlled the car when it was searched); *cf. State v. Herrin*, 323 Or 188, 190, 193, 915 P2d 953 (1996) (concluding that defendant, who was not the registered owner of the car that he was driving, had a "connection with the automobile * * * sufficient to support a privacy interest" because he told police officers that he was buying the car). Accordingly, we proceed to consider whether the police officers lawfully searched the car.

The parties dispute the validity of that warrantless search of the car under the "automobile exception" to the warrant requirement. Although warrantless searches are presumptively unconstitutional, the state may rebut that presumption and avoid the suppression of evidence obtained through a warrantless search by proving that the search was not "unreasonable." *State v. Paulson*, 313 Or 346, 351, 833 P2d 1278 (1992). A search is not unreasonable if it is performed pursuant to a "recognized exception[] to the warrant requirement." *Id.*

One of those recognized exceptions is the "exigent circumstances exception," which "allows the police to conduct a search without a warrant if the search is both supported by probable cause and conducted under exigent circumstances." *State v. Meharry*, 342 Or 173, 177, 149 P3d 1155 (2006). Among other things, exigent circumstances include situations where evidence is likely to be lost or destroyed unless the police take immediate action. *Id.*

The "automobile exception" is a "subset" of the exigent circumstances exception. *Id.* "[T]he mobility of a vehicle, by itself, creates an exigency 'because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.'" *Id.* (quoting *State v. Brown*, 301 Or 268, 275-76, 721 P2d 1357 (1986)). To satisfy the automobile exception, the state must show that (1) the car was

mobile when the police "'encounter[ed] it in connection with a crime'"; and (2) the police had probable cause to search the car. *State v. Farmer*, 258 Or App 693, 701, 311 P3d 888 (2013) (quoting *State v. Kurokawa-Lasciak*, 351 Or 179, 192, 263 P3d 336 (2011)).

Defendant does not contest that the car was mobile when Calloway stopped it for the front license plate violation. The dispositive issue, therefore, is whether the police had probable cause to search the car. In the trial court, the state contended that the police had probable cause to search the car based on the drug-detection dog's alert at the passenger door of the vehicle. Defendant argues that the state failed to demonstrate that the alert was sufficiently reliable to provide probable cause for the search.

"[A]n alert by a properly trained and reliable drug-detection dog can be a basis for probable cause to search." *State v. Foster*, 350 Or 161, 163, 252 P3d 292 (2011). However, determining whether a "particular alert by a particular dog provides probable cause is an issue that requires an individualized inquiry, based on the totality of the circumstances known to police, which typically will include such considerations as the dog's and its handler's training, certification, and performance." *Id.*

In *Foster*, the court concluded that the state had adequately shown that the drug-detection dog in that case—Benny—was sufficiently reliable so that his alert provided probable cause to search for drugs. The record in *Foster* included detailed testimony about Benny's and his handler's training, certification, and performance. *Id.* at 165-68. In contrast, the court in *State v. Helzer*, 350 Or 153, 252 P3d 288 (2011), concluded that the state had failed to make an adequate showing that a drug-detection dog—Babe—was sufficiently reliable. The record in *Helzer* included only "vague" and "general" information about the handler's and Babe's training, certification, and performance. *Id.* at 157-59.

We summarized the rules established by *Foster* and *Helzer* in our decision in *Farmer*, explaining that the state can rely on a drug-detection dog's alert as a basis for probable cause if the evidence about the dog's training and certification discloses how the methods of training and

testing employed ensured that the dog's alerts are reliable. The state can satisfy that standard by showing that the "dog-handler team [was] *trained* in a manner that ensures that the dog alerts in response to drug odors, as opposed to, for example, a desire for a reward, nondrug odors, or handler cues or physical or scent trails left by the person who hid the drugs," and that the team achieved certification after being "*tested* in a controlled environment, where precautions against human cuing have been taken and the dog's accuracy can be assessed because the persons conducting the test know where the dog should alert and where it should not." 258 Or App at 711 (emphases in original). Additionally, the state may be able to rely on field reports of the dog's performance if "'their significance is sufficiently developed through testimony at the hearing or is self-evident.'" *Id.* (quoting *Helzer*, 350 Or at 160 n 4). However, "in all events, the value of field records is limited because it is unlikely that either false positives or false negatives will be detected in the field." *Id.*

Here, we easily conclude that the state did not create a sufficient record to support the use of Quincy's alert as a basis for probable cause to search the car. At the suppression hearing, the state elicited testimony from Raiser that he had received some "special training" to be a drug-detection dog handler. Further, Raiser testified that Quincy had received some training to detect marijuana, heroin, cocaine, and methamphetamine. He also stated that Quincy had been deployed 20 to 50 times. Finally, he gave his opinion that Quincy was "a reliable drug dog." That is not sufficient to satisfy the standards set out in *Foster* and *Helzer*. First, the record includes no details at all of Raiser's and Quincy's training, much less how that training ensured that Quincy would alert only to drugs and not in response to nondrug odors, handler cues, or other distractions. Second, the record did not show whether Raiser and Quincy had been certified or, if they were, what kind of test they had to pass to obtain that certification. Finally, the state provided no information about Quincy's field performance beyond the fact that he had been deployed 20 to 50 times.

The state rejoins that, even if Quincy's alert was not adequate to support probable cause on its own, it could still

be considered along with other information as part of the totality of the circumstances constituting probable cause for the search. In support of that argument, the state points to a footnote in *Helzer*, where the court explained that "[t]he fact that a particular dog alert in a given case is not sufficiently reliable to provide probable cause does not necessarily foreclose any reliance on or consideration of the alert." *Helzer*, 350 Or at 156 n 2. Rather, if the "alert has some degree of reliability, the alert still may be considered along with *other* information in the totality of the circumstances analysis of whether officers searched with probable cause." *Id.* (emphasis in original). According to the state, the record demonstrated that Quincy's alert had "some degree of reliability" as a result of Raiser's testimony that he considered Quincy to be a "reliable drug dog."

We rejected a similar argument in *Farmer*, 258 Or App 693. There, the state also argued that a drug-detection dog's alert, although not sufficient to provide probable cause in itself, should nevertheless be considered along with the totality of the circumstances. We disagreed, explaining that there was nothing in the record to "establish the [drug-detection dog's] reliability to any degree." *Id.* at 714. That was the case because the record did not "indicate that any steps were taken, at any point in [the drug-detection dog's] training and testing, to protect against the possibility that her alerts in training and testing were based on handler cues or human [scent] trails, as opposed to the detection of drugs." *Id.* Furthermore, the testimony about the dog's field deployments did not provide a basis to "draw any inferences about [the dog's] reliability." *Id.*

The outcome is the same here. As in *Farmer*, there was no information in the record indicating what steps, if any, were taken in Quincy's training and testing to protect against the possibility of erroneous alerts. There also was no evidence about his field performance—20 to 50 deployments with no specified success rate—that could lead a court to draw any inferences about his reliability. Thus, the record did not establish Quincy's "reliability to any degree." Accordingly, the alert could not be considered along with other facts in the totality of the circumstances.

Finally, the state advances an alternative, "right for the wrong reason" argument in favor of affirmance. As discussed above, during the search, defendant dropped a baggie of methamphetamine after the police removed him from Crier's car, and he does not assign error to the admission of that evidence on appeal. The state asserts that—regardless of the reliability of Quincy's alert—we should conclude that the police had probable cause to believe that there were drugs in the car based on the baggie that defendant dropped. Defendant retorts that the state never made that argument in the trial court and, under the test set out by the Supreme Court in *Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 20 P3d 180 (2001), we should not consider it on appeal. We agree with defendant.

In *Outdoor Media Dimensions Inc.*, the court articulated a three-part test for determining whether an appellate court may affirm a trial court's ruling on grounds not advanced in the trial court:

> "The first condition is that, if the question presented is not purely one of law, then the evidentiary record must be sufficient to support the proffered alternative basis for affirmance. That requires: (1) that the facts of record be sufficient to support the alternative basis for affirmance; (2) that the trial court's ruling be consistent with the view of the evidence under the alternative basis for affirmance; and (3) that the record materially be the same one that would have been developed had the prevailing party raised the alternative basis for affirmance below. In other words, even if the record contains evidence sufficient to support an alternative basis for affirmance, if the losing party might have created a *different* record below had the prevailing party raised that issue, and that record could affect the disposition of the issue, then we will not consider the alternative basis for affirmance. The second condition is that the decision of the lower court must be correct for a reason other than that upon which the lower court relied. Third, and finally, the reasons for the lower court's decision must be either (a) erroneous or (b) in the reviewing court's estimation, unnecessary in light of the alternative basis for affirmance."

331 Or at 659-60 (emphasis in original).

Here, the first *Outdoor Media Dimensions Inc.*, condition is determinative because the evidentiary record is not

sufficient to support the state's proffered alternative argument. The state's argument depends on the inference that, "when the troopers started to search Crier's vehicle," they were already aware that defendant had dropped the drugs.[4] However, the record does not reveal exactly when defendant dropped the methamphetamine. The court's written factual findings—incorporating the facts section of defendant's motion to suppress memorandum—provide only that defendant dropped the baggie "[d]uring the search." The testimony at the pretrial hearing gives little additional clarity. Calloway testified that he did not see defendant drop the baggie, but that he learned that defendant had dropped the drugs while the search was underway—sometime after he had opened the makeup bag, but before the officers opened the trunk. Further, Raiser also testified that he did not see defendant drop the baggie. He stated that he saw defendant in handcuffs, and saw the methamphetamine that defendant had dropped, but he did not specify how far the search had progressed—other than that they had not yet opened the trunk. Finally, Holloran provided no testimony about the timing of the drop.

Thus, the record is not sufficient to support the inference that the police officers had probable cause to search for drugs, *before* they started to search Crier's car, based on the baggie of methamphetamine dropped by defendant. Additionally, had the state raised this argument below, the record might have developed differently. Defendant would have had greater incentive to press the officers on the timing of the drug drop, and he might also have chosen to offer his own testimony on that issue. Therefore, we do not reach the state's "right for the wrong reason" argument.[5]

In sum, because the state did not prove that Quincy's alert was sufficiently reliable to provide probable cause to

---

[4] At oral argument, the state clarified its position, explaining that, in its view, the record supported the inference that defendant dropped the drugs before the police discovered any contraband in the vehicle.

[5] We note that the state does not articulate an argument that the dropped baggie justified the search other than by providing probable cause, at the outset, to search the entire car. The state does not, for example, contend that the baggie provided the police with probable cause to continue an initially unlawful search of the car, or to perform a lawful search of the trunk in spite of an unlawful search of the passenger compartment, and we express no opinion on those issues.

search the car, the state failed to justify the search under the automobile exception. Accordingly, the state failed to show that the warrantless search of the car was not unreasonable, and the trial court erred in denying defendant's motion to suppress the evidence discovered during the search.

In Case Number 110036CR, reversed and remanded; in Case Number 130216CM, affirmed.